UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| William Brewster BROWNVILLE, | |
| Plaintiff, | Civil No. 3: 14-cv-1472 (JBA) |
| v. | |
| INDIAN MOUNTAIN SCHOOL, | |
| Defendant. | August 24, 2017 |

**RULING ON PLAINTIFF'S MOTION TO AMEND COMPLAINT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Indian Mountain School ("IMS") moves [Doc. # 112] for summary judgment on all five counts of Plaintiff's complaint.[1] Plaintiff moves [Doc. # 111] to amend the Complaint to add an allegation that Indian Mountain School's Headmaster, Mr. Peter Carleton, was the alter ego of the school. For the reasons set forth below, the Court denies Plaintiff's Motion to amend the complaint as futile and grants Defendant's Motion for summary judgment in part. This case will proceed to trial on Counts 1, 2, and 3, with the Court reserving opinion on Count 4.

I. Background

Plaintiff William Brewster Brownville ("Plaintiff" or "Mr. Brownville"), was enrolled as a boarding student at IMS, a private school in Connecticut, from 1983 to 1987, when he was 12-15

---

[1] The parties previously briefed the motion for summary judgment [Docs. ## 76, 84, 86]. After the briefing was complete, they became aware of an appeal pending before the Connecticut Supreme Court in *Doe v. Boy Scouts of America Corp.* that would have an effect on the Court's analysis of the statute of limitations issue in this case. The Court stayed the case pending the outcome of *Boy Scouts*. After the Connecticut Supreme Court issued its ruling, *Doe v. Boy Scouts of America Corp.*, 323 Conn. 303, 340 (2016), Defendant renewed its motion for summary judgment. Both parties have incorporated some of the prior briefing in the motions currently pending before the Court.

years old. (Def.'s D. Conn. Loc. Civ. R. 56a(1) Statement ("56a(1) Stmt.") ¶¶ 1-2; Pl.'s D. Conn. Loc. Civ. R. 56a(2) Statement ("56a(2) Stmt.) ¶¶ 1-2.) Plaintiff claims that he was subject to numerous instances of sexual abuse during his time at school, both at the hands of a teacher named Christopher Simonds and at the hands of IMS's Headmaser, Peter Carleton. (Ex. G ("Brownville Tr.") to Mattei Aff. [Doc. # 84-1] at 122, 184-87.) Further facts established by the summary judgment record will be identified as necessary in the following analysis.

## II. Discussion

IMS moves for summary judgment on all five Counts of Plaintiff's complaint. Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

### A. The Negligence and Recklessness Claims (Counts 1-3) Fall Within the 30-Year Statute of Limitations

IMS moves for summary judgment on Plaintiff's first three counts—negligent supervision, recklessness, and negligent infliction of emotional distress—on statute of limitations grounds, claiming that these claims are time-barred under Conn. Gen. Stat. § 52-584, which applies to unintentional negligence and recklessness claims.[2] (Mem. Supp. Mot. Summ. J. [Doc. # 113] at 5.) Plaintiff responds that in promulgating Conn. Gen. Stat. § 52-577d, the Connecticut legislature extended the statute of limitations for any tort action—intentional or unintentional—where the injury is caused by sexual abuse of a minor, and that his claims are timely under this 30-year limitations period. (Opp'n [Doc. # 120] at 3.) Section 52-577d reads:

> Notwithstanding the provisions of section 52-577, no action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault may be brought by such person later than thirty years from the date such person attains the age of majority.

Conn. Gen. Stat. § 52-577d.

As noted in the Court's Ruling on Defendant's Motion to Certify a Question [Doc. # 147], the holding in *Doe v. Boy Scouts of America Corp.* squarely addresses which statute of limitations applies. In *Boy Scouts*, the Connecticut Supreme Court held:

> when the legislature enacted § 52-577d, it intended for the statute to apply to actions sounding in negligence and recklessness and to carve out such actions from the scope of § 52-584. Accordingly . . . § 52-577d applies not only to actions against the perpetrators of sexual abuse of minors, but also to actions against parties whose

---

[2] Section 52-584 reads in pertinent part:

> No action to recover damages for injury to the person . . . caused by negligence, or by reckless or wanton misconduct . . . shall be brought but within two years from the date when the injury is first sustained or discovered . . . .

3

negligent acts or omissions legally caused the personal injuries suffered by the victims of such abuse.

323 Conn. 303, 340 (2016).

Given the clarity of the holding in *Boy Scouts* and its clear application to the facts of this case, it is controlling. The thirty-year statute of limitations set forth in Conn. Gen. Stat. § 52-577d is applicable and Plaintiff's negligent supervision, reckless supervision, and negligent infliction of emotional distress claims are timely.

### B.     Intentional Infliction of Emotional Distress (Fourth Count)

In order to prevail on a claim for the intentional infliction of emotional distress ("IIED") in Connecticut, a plaintiff must establish four elements:

> (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Petyan v. Ellis*, 200 Conn. 243, 253 (2006). "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Ancona v. Manafort Bros., Inc.*, 56 Conn. App. 701, 712 (2000). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Carrol v. Allstate Insurance Co.*, 262 Conn. 433, 443 (2003).

Defendant argues that summary judgment should be granted for three reasons: (1) non-feasance alone cannot support an IIED claim because it is neither extreme nor outrageous as a matter of law and, even if it were, none of the school's acts or omissions rises to the level of extreme

4

outrageousness to support the claim; (2) the acts of the employees fall outside the scope of their employment, and therefore cannot be attributed to the school, and (3) the headmaster cannot be treated as the "alter ego" of the school for purposes of establishing liability. (Mem. Supp. Mot. Summ. J. at 15.)

Plaintiff abandons any claim to liability on a theory of respondeat superior. (Original Opp'n [Doc. # 84] at 31.) Rather, he proceeds on two theories. First, Plaintiff claims that "Peter Carleton was the alter ego of IMS, and his sexual assaults and abuse are attributed to the school." (Opp'n at 31.) Second, he argues that IMS "utterly failed to act to prevent harm" (*id.* at 32), "affirmatively continued Simond's employment at the school for years" despite numerous red flags about his behavior (*id.* at 32-33), and that with respect to Mr. Carleton, "there is no reasonable explanation why Carleton's lascivious behavior did not result in his termination." These omissions and commissions, which include a failure to properly investigate allegations of sexual abuse, are sufficiently extreme and outrageous, Plaintiff claims, to support his claim for IIED.

1. Alter Ego Claim

Plaintiff argues that IMS can be held directly liable because Peter Carleton, headmaster of the school, is the alter ego of IMS. Under Connecticut law,

> a corporate employer may be liable in common-law tort for an employee's injury if the assailant can be identified as the alter ego of the corporation, or the corporation has directed or authorized the assault. . . . Indeed, only when the assailant is of such rank in the corporation that he may be deemed the alter ego of the corporation under the standards governing disregard of the corporate entity is attribution of corporate responsibility for the actor's conduct appropriate. It is inappropriate where the actor is merely a foreman or supervisor.

*Suarez v. Dickmont Plastics Corp.*, 242 Conn. 255, 275 (1997) (*citing Jett v. Dunlap*, 179 Conn. 215 (1979)).

In Connecticut, "the alter ego test is stringent" and requires that "the corporation, functionally speaking, have no separate existence from the alter ego who controls and dominates the corporation's affairs." *Patel v. Flexo Converters U.S.A., Inc.*, 309 Conn. 52, 58–59 (2013). The Connecticut Supreme Court has recognized two tests for alter egos, the instrumentality rule and the identity rule. The instrumentality rule requires, as one of its three elements, "[c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice . . . so that the corporate entity . . . had at the time no separate mind, will or existence of its own." *Id.* at 59 n. 7 (*citing Naples v. Keystone Bldg. & Dev. Corp.* 295 Conn. 214, 232 (2010). The identity rule requires a plaintiff to show "that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun . . . ." (*Id.*)

Simply exercising managerial authority (being the "top guy," the "boss" or the "top person on . . . at night") is not enough to show alter ego status. *See Patel*, 309 Conn. at 61. By contrast, when a person is a principal owner, employee, and decision maker, and has the power to dominate a corporation for his or her own personal gain and benefit, and when that person exercises exclusive authority and responsibility for a corporation's actions, he or she is properly treated as an alter ego. *See Century Metal Recycling Private Ltd. v. Metal Worldwide, Inc.*, No. CIV. JKB-12-2650, 2013 WL 4851696, at *6 (D. Md. Sept. 10, 2013) (decided under Connecticut law). Likewise, where a corporation lacks a board of directors, does not observe corporate formalities, is completely controlled with respect to business and financial decisions, and refuses to pay shareholder loans while continuing to pay third-party loans, the corporation has been so dominated by an individual as to be its alter ego. *Patterson v. Geo-Graphics Spegram, Inc.*, No. CV156023954, 2015 WL 9911462, at *1 (Conn. Super. Ct. Dec. 21, 2015).

The evidence proffered by Plaintiff cannot support the claim that Mr. Carleton is the alter ego of IMS. Deposition testimony from John Chandler, former board member at IMS, clarifies that Mr. Carleton worked closely with the board of trustees, but makes no suggestion that he dominated the board. (Ex. C ("Feb. 4, 2015 Chandler Tr.") to Mattei Aff. [Doc. # 84-2] at 10.) His testimony also establishes that the board (composed of 16 trustees) held regular meetings. (*Id.*)

Assistant Headmaster Carver testified that Mr. Carleton kept secrets from the Board and that he actively sought to mislead the board about the allegations of Mr. Simonds' sexual impropriety. Mr. Carver testified that

> [t]here was to be a meeting . . . of the executive committee of the board of trustees to discuss the issue of Chris Simonds and what to do . . . . Peter told me that I was not to raise any issues at this meeting with the executive committee concerning any discussions I had had with Peter Carleton regarding Chris Simonds and the pornography, or my concerns over the previous, what now would have been, eight years or so.

(Carver Tr. 102:1-17.) Mr. Carver further testified that he understood Mr. Carleton to be asking that he "flagrantly lie to that group of trustees who were trying to determine how to deal with the issues." (Carver Tr. 102:20-23.)

This testimony is totally in contradiction with the assertion that Mr. Carleton dominated the board. First, both Mr. Carver and Mr. Chandler indicate that corporate formalities were respected: the board held regular meetings and heard presentations from the headmaster. Second, there would be no need for Mr. Carleton to lie to the board or to demand that Mr. Carver lie to the board if Mr. Carleton either dominated IMS completely or were de facto synonymous with IMS. The fact that Mr. Carleton felt the board had to be misled underscores its independence from him

7

and that if the truth had come out, the board would have acted independently of Mr. Carleton and potentially against his wishes.[3]

No facts are in evidence showing the kind of control or domination of the board necessary to support an alter ego theory of liability and no reasonable juror could find that Peter Carleton so dominated and controlled the board that the school became his alter ego. Thus, no reasonable juror could find IMS liable for intentional infliction of emotional distress on the basis of Mr. Carleton's actions, understood as the actions of the school.

2. IMS's Nonfeasance and Omissions

Plaintiff's second theory of liability for IIED focuses on the actions of the Headmaster, Assistant Headmaster Steven Carver, IMS board members, the school nurse, the school psychiatrist, "and everyone else with actual knowledge of Simonds' and Carleton's prurient interest in young boys." (Opp'n at 32.) Plaintiff claims that IMS knew of Mr. Simonds' proclivities and "utterly failed to act to prevent harm" by "affirmatively continu[ing] Simonds' employment at the school for years," "affirmatively continu[ing] to offer him housing," "affirmatively allow[ing] him to have daily (and nightly) private contact with young boys," and "encourag[ing] boys to join his 'print club' . . . ." (Opp'n at 32.)

With respect to Mr. Carleton, Plaintiff argues that the IMS board was aware of Mr. Carleton's "lascivious behavior" and "bizarre and open fascination with the sexual anatomy and

---

[3] As discussed below, Plaintiff filed an untimely submission of documentary evidence in support of his motion to amend the complaint to include explicit allegations of alter ego status. This evidence, however, does not support the claim that Mr. Carleton was the alter ego of the school.

8

activities of the young boys in his care" but that it refused to terminate him and "allowed Carleton to have 24 hour, unsupervised access to the IMS students living in his basement." (Opp'n at 33.)

Defendant argues that claims of nonfeasance are insufficient in Connecticut as a matter of law to support IIED claims and relies on the Connecticut Supreme Court's decision in *Carrol v. Allstate Ins. Co.*, which held on the facts of that case that "the evidence was not sufficient for a jury reasonably to conclude that the defendant's conduct in its fire investigation was extreme and outrageous." 262 Conn. 433, 443-44 (2003). This holding, however, does not establish the broad rule that nonfeasance, as a matter of law, cannot ever support an IIED claim. Rather, in *Carrol*, where the insurance company failed to conduct a thorough investigation as to the source of a fire and concluded too quickly that the plaintiffs had set the fire intentionally, the Connecticut Supreme Court reasoned that "[a]s distressing as this insurance investigation may have been to the plaintiff, however, it simply was not so atrocious as to trigger liability for *intentional* infliction of emotional distress." *Id.* This line of reasoning leaves open the possibility that a different course of events could have been atrocious enough.

Although *Carrol* does not declare a rule of law that nonfeasance is insufficient to support a claim of IIED, it does establish a high bar for supporting IIED claims by claims of omission or nonfeasance and Connecticut courts have accordingly regularly held that nonfeasance, failure to investigate, or permitting conduct to continue does not support claims of IIED. *See, e.g. Williams v. Community Solutions*, 932 F. Supp. 2d 323, 337-38 (D. Conn. 2013) (holding that insufficient investigation of claims of sexual harassment were insufficient to support IIED claims and collecting cases); *Giard v. Town of Putnam*, No. CV085002754S, 2008 WL 5481273, at *10–11 (Conn. Super. Dec. 3, 2008) (finding no intentional infliction of emotional distress because there had been no "affirmative misbehavior" where defendant guidance counselor failed to stop student's

9

suicide, despite student's announcement that he was going to kill himself); *Kilduff v. Cosential, Inc.*, 289 F.Supp.2d 12, 22 (D. Conn.2003) (dismissing intentional infliction of emotional distress claims against CEO who failed to act in response to plaintiff's complaint detailing ongoing, serious sexual harassment by her supervisor because, whether "[c]haracterized as either a failure to respond or to prevent, or choosing to ignore, such conduct does not rise to the level of extreme and outrageous behavior") (internal quotation marks omitted); *Abate v. Circuit-Wise, Inc.*, 130 F.Supp.2d 341, 348 (D. Conn. 2001) (holding that plaintiff had not alleged extreme and outrageous conduct because defendant's failure to prevent sexual harassment does not rise to the level of intentional, extreme and outrageous conduct that would support a claim for intentional infliction of emotional distress); *Dyson v. Colon*, No. CV106016063S, 2011 WL 4716281, at *3 (Conn. Super. Sept. 15, 2011).

To determine whether Plaintiffs have raised material issues of fact with respect to IIED, the key locus of analysis is not individual teachers or IMS employees, but whether the board of trustees knew or should have known that emotional distress was a likely result of its conduct and whether its nonfeasance was extreme and outrageous.

The record reflects three instances at which the board or individual board members were made aware of Mr. Simonds' sexual proclivities. First, Bernice Harned, IMS's nurse from 1975 to 1978, testified during deposition that in June of 1977 she informed Richard Rouse, IMS's previous headmaster and member of the board of trustees, that Christopher Simonds possessed hard-core pornography depicting heterosexual and homosexual intercourse between adults and children. (Ex. P ("Harned Tr.") to Mattei Aff. [Doc. # 84-4] at 29). Ms. Harned testified that she told Mr. Rouse about the pornography, and also that she was aware that Mr. Simonds cultivated a group of boys and that he touched students inappropriately. (*Id.*) Second, Ms. Harned testified that she and

Assistant Headmaster Carver also met with William Cuddy, chairman of the board of trustees, to report the same information. (*Id.* at 36.)

Third, in April 1985, the board became aware of allegations that Christopher Simonds had abused a child in 1978 or 1979 when an aggrieved father whose child had been abused at the hands of Mr. Simonds in 1978 or 1979 wrote a letter to the school. (Ex. A ("IMS's Answer and Affirmative Defenses") to Mattei Aff. [Doc. # 84-2] ¶ 67 for admission of knowledge; Ex. L ("Lauretano Report") to Mattei Aff. [Doc. # 84-3] at 9.) Because of these allegations, Mr. Simonds was fired. The record thus supports the claim that the Board was aware of certain red flags and that, as a result of one of them, it fired Mr. Simonds. However, the record also contains some evidence that the Board of Trustees was not aware of allegations of abuse leveled against either Mr. Simonds or Mr. Carleton. Trustee Paul Levin consistently testified that the board was not aware of any such allegations, and testified clearly that the board was never notified via report or otherwise of Mr. Simonds' abuse until 1985. (Ex. I ("Levin Tr.") to Mattei Aff. [Doc. # 84-2] at IMS 0000713.)

The high bar established by the Connecticut Supreme Court in *Carrol* for proving IIED on the basis of nonfeasance or omission makes it difficult to raise a material issue of fact as to whether the Board was aware of sufficient red flags, but given the state of the evidentiary record submitted at this stage, the Court will reserve judgment on the claim of IIED under a direct theory of liability until trial after presentation of Plaintiff's evidence. Fed. R. Civ. P. 50(a)(1).

### C. Breach of Fiduciary Duty

Defendant argues that the Court should grant summary judgment on Plaintiff's fifth count, breach of fiduciary duty, because the relationship between student and school is not a fiduciary relationship and thus there can be no breach of such a duty.

This Court has previously concluded that no fiduciary duty exists *per se* between a school and its students. "The Court's research has not revealed a single case in any state or federal court within the Second Circuit holding or even suggesting that a secondary school—public or private, boarding or day-session—or its employees owe a fiduciary duty to its students." *Bass ex rel. Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307, 330 (D. Conn. 2010). This case has been cited for this principle by the Second Circuit (*see Knelman v. Middlebury College*, 570 Fed. App'x 66, 69 (2d Cir. 2014).

The Connecticut Supreme Court's refusal to define the nature of a fiduciary relationship leaves open the possibility that such a relationship could arise between a teacher and a student. *Doe v. Hartford Bd. of Educ.*, No. CV146049842S, 2016 WL 5798794, at *6 (Conn. Super. Ct. Aug. 31, 2016).

However, even where a fiduciary relationship may arise between a student and an individual teacher, imputing such a relationship to a school requires more. In *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.* the Second Circuit found that the Diocese entered into a fiduciary relationship with a particular minor parishioner where the parishioner had developed a close, fiduciary relationship with a priest employed by the Diocese and the Diocese knew of and encouraged the development of that relationship. 196 F.3d 409, 430.

On this record, a jury could not reasonably find that the school was aware of, or encouraged, the abusive relationships that arose between Plaintiff and his abusers. First, although Plaintiff alleges that Mr. Simonds developed close relations with a group of boys enrolled in the print club, no evidence has been proffered that Mr. Brownville was a member of that group and there is no other evidence showing that a fiduciary relationship arose between Mr. Brownville and Mr. Simonds.

The evidence of Mr. Carleton's relationship with Mr. Brownville may stand otherwise. Mr. Brownville testified in deposition that Mr. Carleton became a father figure to Mr. Brownville and the Mr. Brownville came to place his trust in him:

> [Headmaster Carleton and I] were pretty close. . . . [Our relationship] developed over the course the previous two years. I would kind of go to him with stuff and he'd become kind of like a father. . . . I just wanted to be around him because he was so, I don't know, he was easy to be with and he kind of treated me like I matter . . .

(Brownville Tr. at 156.)

However, even if a fiduciary relationship arose between Mr. Carleton and Mr. Brownville, Plaintiff has not proffered evidence that the school was aware of or encouraged the development of this relationship. While Mr. Brownville resided in Mr. Carleton's basement along with three other pupils in the fall trimester of his final year, nothing in the summary judgment record supports an inference that the school encouraged Mr. Carleton to develop any particular type of relationship with the students living in his house. As Mr. Carver testified, "for a number of years Peter Carleton had students living in his house, and it was one of the strongest criticisms of Peter Carleton, this on-going decision to have students living in their home. And it would come up every year in evaluation. And Peter would assume that they were jealous and make some comments and blow it off." (Carver Tr. at 172-73.) This case lacks the "something more" that was present in *Martinelli* and no reasonable juror could find that the school encouraged Mr. Carleton to develop a fiduciary relationship with the Plaintiff.

### III. Plaintiff's Motion to Amend the Complaint

Plaintiff moved separately [Doc. # 111] to amend his complaint to allege the alter ego theory. In the Second Circuit, a court may deny a motion to amend a filing upon a finding of futility. *Roller Bearing Co. of Am., Inc. v. Am. Software, Inc.*, 570 F. Supp. 2d 376, 383 (D. Conn.

13

2008). An amendment would be futile if "a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Dougherty v. Town of North Hempstead Bd. of Zoning* Appeals, 282 F.3d 83, 87 (2d Cir. 2002). Having considered the evidence submitted by the Plaintiff in support of the motion and having found that it does not support an alter ego theory, the Court finds the motion to amend futile.

Plaintiff filed supplemental submission [Doc. # 133] of documentary evidence in support of the claim that Mr. Carleton was the alter ego of IMS. Exhibit A to the supplemental submission is a copy of the minutes for the July 11, 1977 IMS Board of Trustees meeting, which show that the school had a board and that the headmaster sat on the board. These minutes reflect that Mr. Carleton made a presentation regarding enrollment. Exhibits B and C are copies of the 1978-1979 and 1984-1985 IMS Student Handbooks, respectively. These handbooks reflect that Mr. Carleton was one member of a 16-person board of trustees as well as the School's headmaster. Exhibit D is a copy of the minutes for the October 10, 1980 Board of Trustees meeting, at which Chairman of the Board John Chandler presided.

Exhibit E, which Plaintiff claims demonstrates Mr. Carleton's domination of the school, is a copy of the "Headmaster's Report to Trustees on October 1, 1974." Under his first topic of discussion, student enrollment, the headmaster described enrollment problems and their fiscal impact to the school. He then proposes a solution—admitting female boarders during the week— and invites the board to take it up: "Both of these alternatives are poor. But, girls as five day boarders eliminates the weekend problem. It is worth discussing." Requesting board discussion (and not simply declaring an outcome) suggests that corporate formalities are respected and that Mr. Carleton did not completely dominate the board. Further, the report later includes a series of

14

excerpts from IMS's by-laws that spell out the lines of authority and the relations between headmaster and board:

> The Board operates according to the Indian Mountain School, Incorporated by-laws, with which each member must acquaint himself. It is the total Board membership which assumes the ultimate responsibility for the operation and continuity of the school and, through the headmaster, sees that the policies of the school are carried out.

(Ex. E ("1974 Report") to Ponvert Aff. [Doc. # 133-2] at 7.) The by-laws explain how sub-committees of the board are formed and note that they should not be decision-making bodies, since decisions should be taken by the board as a whole. *Id.* at 9. Further, they declare that "upon becoming a member of this Board, one assumes a dual nature. He is at once a unit member of one body as a Trustee and is, at the same time, a free and separate individual." *Id.* Thus, Mr. Carleton's presence on the board is distinguished (however metaphysically) from his identity as a board member.

The by-laws contain a long section describing the "Trustee-Headmaster Working Relationship." The first item in this section states that "The Headmaster is primarily responsible to the Board of Trustees and not to any individual committee or member for the twelve-moth operation of Indian Mountain School." Further, this document declares that "The Headmaster 'shall be an agent of the Corporation with full and complete power, subject to the Bylaws and to the resolutions of the Trustees and the Executive Committee, to manage and control the School . . . .'" *Id.*

These by-laws lay out a corporate structure in which the board operates as a whole on behalf of the school and the headmaster works with, but also reports to, the board. The minutes suggest that the board and the headmaster respected this corporate form: the headmaster presented

proposals to the board regarding enrollment, for example, and the board discussed and voted on those proposals.

Nothing in these documents approaches the kind of complete domination or identity of interest necessary to support a claim that Mr. Carleton was the alter ego of IMS. For this reason, any amendment to the Complaint would be futile.

## IV. Conclusion

For the reasons set forth above, the Court DENIES Plaintiff's motion to amend the Complaint [Doc., # 111] as futile; DENIES Defendant's motion for summary judgment [Doc. # 112] on Counts 1, 2, 3; GRANTS Defendant's motion for summary judgment on Count 5; and reserves opinion on Count 4.

IT IS SO ORDERED.

/s/
_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of August 2017.